# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNETICUT

| | |
|---|---|
| FREDERICK F. WHELAN, JR. and MADELINE WHELAN, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiff, | **<u>CLASS ACTION COMPLAINT</u>** |
| v. | **JURY TRIAL DEMANDED** |
| WEBSTER FINANCIAL CORPORATION dba WEBSTER BANK, | |
| Defendant. | |

Plaintiffs, Frederick F. Whelan, Jr. and Madeline Whelan, on behalf of themselves and all others similarly situated, state as follows for his class action complaint against Defendant, Webster Financial Corporation dba Webster Bank, N.A. ("Webster" or "Defendant"):

## INTRODUCTION

1. Between November 27, 2022, and January 22, 2023, Webster, a bank headquartered in Connecticut, with over 170 banking offices and over 300 ATM locations throughout the United States[1], lost control over its computer network and the highly sensitive personal information stored on the computer network in a data breach by cybercriminals ("Data Breach"). On information and belief, the Data Breach has impacted at least 150,000 of Webster's former and current customers. [2]

2. Webster chose to allow its cybersecurity vendors access and control over its customers' highly sensitive and personally identifiable information ("PII").

---

[1] Webster Bank, Wikipedia, https://en.wikipedia.org/wiki/Webster_Bank (last visited April 24, 2023).
[2] Data Breach Affects More than 150,000 Webster Baank Customers in CT, CT Insider, https://www.ctinsider.com/news/article/webster-bank-data-breach-ct-customers-17906370.php (last visited April 24, 2023).

3.     On information and belief, the Data Breach began on or around November 27, 2022, when cybercriminals first accessed Defendant's network, and lasted until January 22, 2023.

4.     On or about January 26, 2023, Webster was first notified that its customers' PII had been involved in the Data Breach. An internal investigation revealed that cybercriminals had gained unauthorized access to Webster's customers' PII including but not limited to names, financial information, and Social Security numbers. [3]

5.      On or around April 10, 2023, five months after the unauthorized party first gained access to customers' PII and almost three months after Webster was informed of the Data Breach, Webster finally notified Class Members about the Data Breach ("Breach Notice") which is attached as **Exhibit A** (notice received by the Plaintiff).

6.     Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the personal information and PII of Plaintiffs, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII—rendering them easy targets for cybercriminals.

7.     Defendant's Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell its customers how many people were impacted, how the breach happened, or why it took the Defendant almost three months to begin notifying victims that hackers had gained access to customers' highly private information.

8.     Defendant's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

---

[3] Webster Bank Reports Third-Party Data Breach https://www.jdsupra.com/legalnews/webster-bank-reports-third-party-data-5682440/ (last visited April 24, 2023).

9.     Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

10.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the private information of Plaintiff and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

11.     Plaintiff, Frederick Whelan, is a natural person and citizen of Massachusetts, residing in Seekonk, Massachusetts, where he intends to remain.

12.     Plaintiff, Madeline Whelan, is a natural person and citizen of Massachusetts, residing in Seekonk, Massachusetts, where she intends to remain.

13.     Defendant, Webster, is a Connecticut Corporation with its principal place of business at 145 Bank Street, Waterbury, CT, 06702.

## JURISDICTION & VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiffs and Defendant are citizens of different states.

15.     Webster is incorporated in Connecticut and maintains its principal place of business in Connecticut at 145 Bank Street, Waterbury, CT, 06702. Webster is thus a Connecticut citizen.

16.     This Court has personal jurisdiction over Webster because it is a citizen in this District and maintains its headquarters and principal place of business in this District.

17.     Venue is proper because Webster maintains its headquarters and principal place of business in this District.

## FACTUAL ALLEGATIONS

*Webster*

18.     Webster is a "leading commercial bank that delivers financial solutions to businesses, individuals, families, and partners." It boasts "over $70 billion in assets"[4] and $2.726 billion in revenue. [5]

19.     As part of its business, Defendant receives and maintains the PII of thousands of customers. In doing so, Defendant implicitly promises to safeguard their PII.

20.     In collecting and maintaining its customers' PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

21.     Indeed, Webster claims in its privacy policy that "your privacy is our top priority. We respect the privacy of your information, and our goal is to maintain your trust and confidence."[6]

22.     Webster also touts that it "uses enhanced security control to keep [] safety at the top of our list" and that it is committed to taking the "privacy and security of your information seriously and our number one goal is to give you peace of mind when it comes to your protection."[7]

---

[4] Webster, https://public.websteronline.com/about (last visited April 24, 2023).
[5] Webster Financial Revenue, Macrotrends, https://www.macrotrends.net/stocks/charts/WBS/webster-financial/revenue#:~:text=Webster%20Financial%20revenue%20for%20the%20twelve%20months%20ending%20March%2031,a%201.64%25%20decline%20from%202020 (last visited April 24, 2023).
[6] Privacy Policy, Webster, https://public.websteronline.com/security/privacy (last visited April 24, 2023).
[7] Security, Webster, https://public.websteronline.com/security (last visited April 24, 2023).

23.     As a self-proclaimed "leader in commercial banking" that handles highly sensitive private information, Webster understood the need to protect its customers' PII and prioritize its data security.[8] In fact, in 2021, Webster released a guideline and checklist named "Is your Company Protected Against Ransomware Attacks?", warning that ransomware attacks "happens every 11 seconds."[9] Defendant advised clients to contact Webster if they "need additional guidance for protecting your company against ransom attacks."[10]

24.

25.     Despite clearly recognizing its duty to do so and advising other companies of the same, on information and belief, Webster has not implemented reasonable cybersecurity safeguards or policies to protect its customers' PII or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. As a result, Webster left significant vulnerabilities in its storage of Plaintiffs' and the Class's PII for cybercriminals to exploit and gain

---

[8] *Id.*
[9] Is Your Company Protected Against Ransomwhere Attacks?, WebsterBank, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://public.websteronline.com/sites/default/files/documents/WEB-0976-Ransomware-Micro-Article-090821.pdf (Last visited April 26, 2023).
[10] *Id.*

access to customers' PII, the very kind of threat "Is Your Company Protected Against RansomWare Attacks?" touts to prevent.

***Webster Fails to Safeguard Customers' PII***

26.     As a condition of receiving banking services from Webster, Plaintiffs provided it with their PII, including their name, Social Security number, and financial account information. Webster used that PII to facilitate its banking services and the needs of Plaintiffs and required Plaintiffs to provide that PII to obtain its services.

27.     In collecting and maintaining PII, Defendant implicitly agreed that it will safeguard the data using reasonable means according to their internal policies and federal law.

28.     On information and belief, Webster provided its cybersecurity vendor with Plaintiffs' PII as part of its management software.

29.     On January 26, 2023, Webster first learned of the Data Breach. According to the Breach Notice, Webster claims that between November 27, 2022, and January 22, 2023, "unauthorized third parties acquired files that contained Webster clients' personal information" *See* attached **Exhibit A**.

30.     In other words, the Data Breach investigation revealed that Webster's customers' PII had been accessed by cybercriminals for two months before discovery and that Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of thousands of its customers' highly private information.

31.     Additionally, Defendant admitted that Plaintiffs' and the Class's PII were actually stolen during the Data Breach, confessing that the information was not just accessed "at various times" but was also "**later posted**" on the internet. Exh. A.

32.     Upon information and belief, the notorious Daixin ransomware gang was responsible for the cyberattack. Daixin is one of the most active ransomware actors, having

6

perpetrated multiple high-profile breaches in the last year alone.[11] Webster, an alleged 'leading' banking company that posted guidelines for cybersecurity, knew or should have known of the tactics that groups like Daixin employ.

33.    On or around April 10, 2023 –five months after the Breach first occurred and almost three months after Defendant learnt of the Breach the Breach – Webster finally notified Class Members about the Data Breach.

34.    Despite its duties and alleged commitments to safeguard PII, Defendant did not in fact follow industry standard practices in securing customers' PII, as evidenced by the Data Breach.

35.    In response to the Data Breach, Webster contends that it has or will be "implement[ing] enhanced security measures to safeguard their networks, systems, and data, including that of Webster's clients." Exh. A. Although Defendant fails to expand on what these alleged "enhanced security measures" are, such measures should have been in place before the

---

[11] Daixin Team, America's Cyber Defense Agency, https://www.cisa.gov/news-events/cybersecurity-advisories/aa22-294a#:~:text=The%20Daixin%20Team%20is%20a,since%20at%20least%20June%202022, (last visited April 24, 2023).

Data Breach.

36.     Through its Breach Notice, Defendant also recognized the actual imminent harm and injury that flowed from the Data Breach, so they encouraged breach victims to take "steps to help protect yourself". Exh. A.

37.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

38.     On information and belief, Webster failed to adequately train its vendors on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over customer PII through a security vulnerability. Webster's negligence is evidenced by its failure to adequately supervise its vendors and prevent the Data Breach and stop cybercriminals from accessing Plaintiffs' and the Class's PII. Further, Webster's Data Breach makes clear that Webster cannot, or will not, protect its customers' PII.

39.     Indeed, Webster recognizes the threat its Data Breach poses in its breach notice. It offered breach victims 24 months of credit monitoring and encouraged them to guard themselves and remain vigilant in order to "protect [their] personal information", offering suggestions including reviewing the "recommendations from the Federal Trade Commission regarding identity theft protection and details regarding placing a fraud alert or security freeze on your credit card file." Webster's warning is ironic since its failure to comply, or ensure its vendors comply, with the Federal Trade Commission's guidelines regarding identity theft protection was what caused the Data Breach in the first place.

*Plaintiff Frederick Whelan's Experience and Injuries*

40.     Plaintiff, Frederick Whelan is a Webster customer.

41.     As a condition of receiving banking services from Webster, Plaintiff provided it with his PII, including his name, Social Security number, and financial account information. Webster used that PII to facilitate its banking services and the needs of Plaintiff and required Plaintiff to provide that PII to obtain its services.

42.     On information and belief, Webster shared Plaintiff's PII with its cybersecurity vendor as part of its provision of management software services to Webster.

43.     Plaintiff provided his PII to Defendant and trusted that it would use reasonable measures to protect it according to their internal policies and state and federal law.

44.     Defendant deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it for almost three months after Webster finally discovered the Data Breach (which had been going on for months by that time).

45.     Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

46.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

47.     As a result of the Data Breach and the recommendations of Defendant's Notice, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through the three main credit bureaus, and monitoring his credit information as suggested by Defendant.

48.     Plaintiff has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

49.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's delay in informing Plaintiff and Class Members about the Data Breach.

50.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Madeline Whelan's Experience and Injuries***

51.     Plaintiff, Madeline Whelan is a Webster customer.

52.     As a condition of receiving banking services from Webster, Plaintiff provided it with her PII, including his name, Social Security number, and financial account information. Webster used that PII to facilitate its banking services and the needs of Plaintiff and required Plaintiff to provide that PII to obtain its services.

53.     On information and belief, Webster shared Plaintiff's PII with its cybersecurity vendor as part of its provision of management software services to Webster.

54.     Plaintiff provided her PII to Defendant and trusted that it would use reasonable measures to protect it according to their internal policies and state and federal law.

55.     Defendant deprived Plaintiff of the earliest opportunity to guard herself against the Data Breach's effects by failing to notify her about it for almost three months after Webster finally discovered the Data Breach (which had been going on for months by that time).

56.     Plaintiff suffered actual injury from the exposure of her PII, including her name, Social Security number, and financial account number —which violates her rights to privacy.

57.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

58.     As a result of the Data Breach and the recommendations of Defendant's Notice, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through the three main credit bureaus, and monitoring her credit information as suggested by Defendant.

59.     Plaintiff has and will spend considerable time and effort monitoring his accounts to protect herself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

60.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's delay in informing Plaintiff and Class Members about the Data Breach.

61.     Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**_Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft_**

62.     Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

63.     As a result of Webster's failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the class have suffered or are at an increased risk of suffering:

    a.   The loss of the opportunity to control how their PII is used;

    b.   The diminution in value of their PII;

    c.   The compromise and continuing publication of their PII;

    d.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    e.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    f.   Delay in receipt of tax refund monies;

    g.   Unauthorized use of stolen PII; and

    h.   The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the

appropriate measures to protect the PII in their possession.

64.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

65.     The value of Plaintiffs' and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

66.     Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

67.     It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

68.     One such example of criminals using PII for profit is the development of "Fullz" packages.

69.     Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

70.     The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain

information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and members of the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

71.     Defendant disclosed the PII of Plaintiffs and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiffs and members of the proposed Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

72.     Defendant's failure to properly notify Plaintiffs and the Class of the Data Breach exacerbated Plaintiffs' and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant failed to adhere to FTC guidelines.***

73.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

74.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices

for business.  The guidelines explain that businesses should:

     a.   protect the personal customer information that they keep;

     b.   properly dispose of personal information that is no longer needed;

     c.   encrypt information stored on computer networks;

     d.   understand their network's vulnerabilities; and

     e.   implement policies to correct security problems.

75.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

76.     The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

77.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## CLASS ACTION ALLEGATIONS

79.     Plaintiffs are suing on behalf of themsleves and the proposed Class ("Class"),

defined as follows:

> **All individuals residing in the United States whose PII was compromised in the Webster Data Breach, including all those who received notice of the breach.**

80. Excluded from the Class is Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

81. Plaintiffs reserve the right to amend the class definition.

82. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

      a.     **Numerosity**. Plaintiffs' claims are representative of the proposed Class, consisting of at least 150,000 members, far too many to join in a single action;

      b.     **Ascertainability**. Class members are readily identifiable from information in Defendant's possession, custody, and control;

      c.     **Typicality**. Plaintiffs' claims are typical of Class member's claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

      d.     **Adequacy**. Plaintiffs will fairly and adequately protect the proposed Class's interests. Their interest does not conflict with Class members' interests, and Plaintiffs have retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

      e.     **Commonality**. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for all Class members. Indeed, it will be necessary to answer the following questions:

    i.    Whether Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

    ii.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    iii.    Whether Defendant was negligent in maintaining, protecting, and securing PII;

    iv.    Whether Defendant breached contract promises to safeguard Plaintiffs' and the Class's PII;

    v.    Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

    vi.    Whether Defendant's Breach Notice was reasonable;

    vii.    Whether the Data Breach caused Plaintiffs' and the Class's injuries;

    viii.    What the proper damages measure is; and

    ix.    Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

f.    Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

83.    Plaintiffs reallege all previous paragraphs as if fully set forth below.

84.     Defendant owed to Plaintiffs and the Class a duty to exercise reasonable care in handling and using the PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

85.     Defendant owed a duty of care to Plaintiffs and members of the Class because it was foreseeable that Defendant's failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that PII—just like the Data Breach that ultimately came to pass. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and members of the Class's PII by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

86.     Defendant owed to Plaintiffs and members of the Class a duty to notify them within a reasonable timeframe of any breach to the security of their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiffs and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiffs and members of the Class to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

87.     Defendant owed these duties to Plaintiffs and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security protocols. Defendant actively sought and obtained Plaintiffs' and the Class's personal information and PII.

88.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant holds vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII—whether by malware or otherwise.

89.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and members of the Class and the importance of exercising reasonable care in handling it.

90.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and members of the Class which actually and proximately caused the Data Breach and Plaintiffs' and members of the Class's injury. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and members of the Class's injuries-in-fact. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and members of the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

91.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and members of the Class actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and

19

which they continue to face.

## COUNT II
## Negligence Per Se
### (On Behalf of Plaintiffs and the Class)

92.     Plaintiffs and members of the Class incorporate the above allegations as if fully set forth herein.

93.     Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and members of the Class's PII.

94.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect consumers' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and the members of the Class's sensitive PII.

95.     Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

96.     The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

97.     Defendant had a duty to Plaintiffs and the Class to implement and maintain

reasonable security procedures and practices to safeguard Plaintiffs' and the Class's PII.

98.     Defendant breached its respective duties to Plaintiffs and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's PII.

99.     Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence per se.

100.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have been injured.

101.     The injury and harm suffered by Plaintiffs and members of the Class were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

102.     As a direct and proximate result of Defendant's negligence per se, Plaintiffs and members of the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

**COUNT III**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

103.     Plaintiffs and members of the Class incorporate the above allegations as if fully set forth herein.

104.     Plaintiffs and the Class had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to

21

unauthorized third parties.

105.    Defendant owed a duty to Plaintiffs and the Class to keep their PII confidential.

106.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and the Class's PII is highly offensive to a reasonable person. Defendant's reckless and negligent failure to protect Plaintiffs' and the Class's PII constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

107.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

108.    Because Defendant failed to properly safeguard Plaintiffs' and the Class's PII, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

109.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiff and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

110.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII is still maintained by Defendant with their inadequate cybersecurity system and policies.

111.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiff and the Class.

112.    Plaintiffs, on behalf of themselves and Class Members, seek injunctive relief to

enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII.

113.    Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

**Count IV**
**Breach of Contract**
**(On Behalf of Plaintiffs and the Class)**

114.    Plaintiffs and members of the Class incorporate the above allegations as if fully set forth herein.

115.    Defendant entered into various contracts with its customers to provide banking services to them.

116.    These contracts are virtually identical to each other and were made expressly for the benefit of Plaintiffs and the Class, as it was their confidential PII that Webster agreed to collect and protect through its services. Thus, the benefit of collection and protection of the PII belonging to Plaintiffs and the Class were the direct and primary objective of the contracting parties.

117.    Webster knew that if it were to breach these contracts with customers, the customers, including Plaintiffs and the Class, would be harmed by, among other things, fraudulent misuse of their PII.

118.    Webster breached its contracts with its customers when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiffs' and Class Members' PII.

119.    As reasonably foreseeable result of the breach, Plaintiffs and the Class were harmed by Webster's failure to use reasonable data security measures to store their PII, including but not

limited to, the actual harm through the loss of their PII to cybercriminals.

120.     Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with their costs and attorney fees incurred in this action.

**Count V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

121.     Plaintiffs and members of the Class incorporate the above allegations as if fully set forth herein.

122.     Upon information and belief, Defendant funds its data security measures from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

123.     As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

124.     Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased services from Defendant and/or its agents and in so doing provided Defendant or its agents with their PII. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PII protected with adequate data security.

125.     Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiff and Class Members for business purposes.

126.     Plaintiffs and Class Members conferred a monetary benefit on Defendant, by paying Defendant as part of Defendant rendering banking related services, a portion of which was to have been used for data security measures to secure Plaintiffs' and Class Members' PII, and by providing Defendant with their valuable PII.

127.     Defendant was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to avoid the data security obligations at the expense of Plaintiff and the Class by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

128.     Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

129.     Defendant acquired the monetary benefit and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

130.     If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant either directly or through their own financial institutions.

131.     Plaintiffs and Class Members have no adequate remedy at law.

132.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII is used; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to

prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

133.     As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm.

134.     Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**COUNT VI**
**Violations of Connecticut Unfair Trade Practices,**
**CT. GEN. STAT. § 42-110**
**(On behalf of Plaintiffs and the Class)**

135.     Plaintiffs and members of the Class incorporate the above allegations as if fully set forth herein.

136.     The Connecticut Unfair Trade Practices provides that:

(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

137.     In the conduct of their business, trade, and commerce, Defendant collected and stored highly personal and private information, including PII belonging to Plaintiffs and the Class.

138.     Defendant knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiffs' and the Class's PII secure and prevented the loss or misuse of that PII.

139. Defendant failed to disclose to Plaintiffs and the Class that their PII was not secure. At no time were Plaintiffs and the Class on notice that their PII was not secure, which Defendant had a duty to disclose.

140. Had Defendant complied with these requirements, Plaintiffs and the Class would not have suffered the damages related to the data breach.

141. Defendant Webster is a "person" as defined by CT. Gen. Stat § 42-110a (3).

142. Defendant are engaged in "trade" or "commerce" as those terms are defined by CT. Gen. Stat § 42-110a (4).

143. At the time of filing this Complaint, Plaintiffs are sending notice to the Attorney General and Commissioner of Consumer Protection pursuant to by CT. Gen. Stat § 42-110g (c). Plaintiffs will provide a file-stamped copy of the Complaint to the Attorney General and Commissioner of Consumer Protection.

144. As alleged herein this Complaint, Defendant engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce and services to customers in violation of the Connecticut Unfair Trade Practices Act, including but not limited to the following:

   a. failing to adequately secure customers' PII;

   b. failing to maintain adequate computer systems and data security practices to safeguard customers' PII;

   c. failing to disclose the material information, known at the time of the transaction – collection and retention of customer PII– that their cybersecurity vendors would not adequately protect and safeguard customers' PII;

   d. inducing customers to use Defendant's services by failing to disclose, and misrepresenting the material fact that Defendant's data security practices were

27

inadequate to safeguard their customers' PII from theft.

145.     Defendant's conduct was unlawful, in that it violated the policy set forth in Connecticut's Unfair Trade Practices, requiring the safeguard of PII, the FTCA, as identified above, and Defendant's common law duty to safeguard PII.

146.     By engaging in the conduct delineated above, Defendant violated the Connecticut Unfair Trade Practices Act by, among other things:

    a.   omitting material facts regarding the goods and services sold;

    b.   omitting material facts regarding the security of the transactions between Defendant and customers;

    c.   omitting material facts regarding the security of the transactions between Defendant and customers who furnished or entrusted their PII;

    d.   misrepresenting material facts in the furnishing or sale of products, goods or services to customers;

    e.   engaging in conduct that is likely to mislead customers acting reasonably under the circumstances;

    f.   engaging in conduct which creates a likelihood of confusion or of misunderstanding;

    g.   engaging in conduct with the intent to induce customers to use Defendant's service;

    h.   unfair practices that caused or were likely to cause substantial injury to customers which is not reasonably avoidable by customers themselves and not outweighed by countervailing benefits to customers; and/or

i. other unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices to be shown at trial.

147.    Defendant systemically engaged in these deceptive, misleading, and unlawful acts and practices, to the detriment of Plaintiffs and the Class.

148.    Defendant's actions in engaging in the conduct delineated above were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Class.

149.    As a direct result of Defendant's violation of the Connecticut Consumer Protection Act, Plaintiffs and the Class have suffered actual damages, including but not limited to: (i) the loss of the opportunity how their PII is used; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect that PII; and (viii) present and future costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

150.    As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices of Defendant alleged herein, Plaintiffs and the Class seek relief under CT. Gen. Stat §

42-110, including, but not limited to, the greater of actual damages, statutory damages, or treble damages for bad faith conduct, injunctive relief, attorneys' fees and costs, as allowable by law.

**COUNT VII**
**Declaratory Judgment and Injunctive Relief**
**(On behalf of Plaintiffs and the Class)**

151.     Plaintiffs and members of the Class incorporate the above allegations as if fully set forth herein.

152.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

153.     An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to employing reasonable data security. Plaintiffs allege that Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiffs and the Class continue to suffer injury due to the continued and ongoing threat of new or additional fraud against them or on their accounts using the stolen data.

154.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.      Defendant owed, and continues to owe, a legal duty to employ reasonable data security to secure the PII it possesses, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

b.      Defendant breached, and continues to breach, its duty by failing to employ reasonable measures to secure its customers' PII; and

30

c.      Defendant's breach of its legal duty continues to cause harm to Plaintiff and the Classes.

155.    The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect its customers' (i.e. Plaintiffs' and the Classes') data.

156.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiffs and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

157.    The hardship to Plaintiffs and the Class, if an injunction does not issue, exceeds the hardship to Defendant if an injunction is issued.

158.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiffs, the Class, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.      For an Order certifying the Class, and appointing Plaintiffs and their Counsel to

represent the Class;

B.       For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C.       For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including but not limited to an order;

    i.       prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.      requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.     requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and the Class;

    iv.      requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

    v.       requiring Defendant to implement and maintain a comprehensive

Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and the Class;

vi.      prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.      requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.      requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.      requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.      requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

xi.      requiring Defendant to conduct regular database scanning and securing checks;

xii.      requiring Defendant to establish an information security training program that includes at least annual information security training

for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and the Class;

xiii.  requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.  requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.  requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as

well as the steps affected individuals must take to protect themselves; and

    xvii.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demand that this matter be tried before a jury.


Dated: May 2, 2023,                           Respectfully Submitted,

                                              /s/  Raina Borrelli
                                              Samuel J. Strauss*
                                              sam@turkestrauss.com
                                              Raina Borrelli*
                                              raina@turkestrauss.com
                                              **TURKE & STRAUSS LLP**
                                              613 Williamson Street, Suite 201
                                              Madison, Wisconsin 53703
                                              T: (608) 237-1775
                                              F: (608) 509-4423
                                              * *Pro hac vice forthcoming*
                                              *Attorneys for Plaintiffs and Proposed Class*

                                              By:____/s/ Kelly A. Fitzpatrick
                                              Kelly Fitzpatrick, Esq. (CT Bar #29764)
                                              KOSKOFF, KOSKOFF & BIEDER, PC
                                              350 Fairfield Avenue
                                              Bridgeport, CT 06640
                                              Phone: (203) 336-4421
                                              Fax:    (203) 368-3244
                                              Email: kfitzpatrick@koskoff.com
                                              *Attorney for Plaintiffs*